UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SHANE GRATTAN,

Petitioner,

v.

JOHN SUTTON, Warden,

Respondent.

Case No.: 3:17-cv-01523-GPC-PCL

**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE RE:**

**PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS**

Before the Court now is Petitioner Shane Grattan's petition for writ of habeas corpus, filed *pro se* on July 26, 2017. (Doc. 1.) Petitioner is currently incarcerated at Wasco State Prison following a first degree murder conviction. (*Id*. at 1-2.) The petition argues Petitioner is entitled to habeas relief for the following reasons: (1) the trial court's excluding evidence of a key witness's prior bad acts deprived Petitioner of his right to confrontation and due process; (2) the trial court's exclusion of evidence showing Petitioner's good character deprived Petitioner of his right to due process; (3) the trial court's decision regarding the testimony of an unavailable witness deprived Petitioner of his rights to confrontation and due process; (4) there was not sufficient evidence to support Petitioner's conviction for first degree murder; and (5) the cumulative error presented deprived Petitioner of his right to due process. (*Id*. at 2.)

The Honorable Gonzalo P. Curiel referred the matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). After a thorough review of the petition, supplement, answer, exhibits, state court records, and state court decisions, the Court recommends DENYING relief.

## II. BACKGROUND

The Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. §2254(e)(1); *see also Summer v. Mata*, 449 U.S. 539, 550 (1981) (holding in part that findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

*A. The People's evidence*

*1. [Petitioner] and the victim*

[Petitioner] lived in his van. He frequently parked the van in a parking lot near a marina on Harbor Drive (Harbor Drive parking lot) throughout January 2012, including during the night and early morning hours of January 18, 2012 to January 19, 2012, when the murder was committed.

The victim, Darrin Joseph, had been using a wheelchair for several months prior to the murder. Joseph checked into a hotel on January 4, 2012, and had paid for a room through January 11. On January 12, Joseph did not have money to pay for a room.

*2. The events preceding the murder*

On the evening of January 18, at approximately 8:45 p.m., David Sommers parked his car in the Harbor Drive parking lot. Sommers saw a wheelchair next to [Petitioner]'s van and noticed that the van doors were open. Sommers could hear voices coming from inside the van.

At approximately 9:00 p.m. that night, another man, Robert Foes, parked his van in the Harbor Drive parking lot near [Petitioner]'s van, intending to sleep in his van that night. Foes also saw the wheelchair next to [Petitioner]'s van. In addition, Foes saw a bicycle leaning against the front of [Petitioner]'s van. As he was falling [a]sleep at approximately 9:00 to 9:30 p.m., Foes heard two men shouting. One of the men said something about going back to get his ".45" and the other responded, "It better be loaded or I'll get my .45."

The jury also heard the preliminary hearing testimony of Charles Ketring, whom the trial court found was legally unavailable to testify at trial.

2

Ketring was sleeping in his van in the Harbor Drive parking lot on the night of the murder. At approximately 11:00 or 11:30 [p.m.], Ketring was awakened by an argument. Ketring looked out of his van and saw [Petitioner] get into [Petitioner]'s van. Ketring then heard banging from inside [Petitioner]'s van.

### 3. Daniel Statler's testimony

Daniel Statler was homeless. He stayed in the marina near the Harbor Drive parking lot and used his bicycle for transportation. One evening in January 2012 [FN. On appeal, the People contend that this was the evening prior to the murder. Statler did not testify as to the date on which he interacted with [Petitioner].], Statler met [Petitioner] at the marina. Statler helped [Petitioner] clean up [Petitioner]'s van and then spent the night in the van, before leaving the next morning.

The next evening, Statler returned to [Petitioner]'s van at about 8:00 p.m. There was another person there, a white male in his mid-50s with white or gray hair. [FN. During a police interview, Statler identified Joseph as the other man he saw in the van.] [Petitioner] and the man told Statler that the man had just purchased [Petitioner]'s van. [Petitioner] left, and the man told Statler that he was sorry that he had bought the van because he was under the impression that Statler wanted to buy it. The man had some jewelry that he was trying to sell and asked Statler whether he knew anyone who would want to buy the jewelry. Statler told the man that he could possibly help the man sell the jewelry. [Petitioner] returned to the van and became angry. According to Statler, [Petitioner] thought that Statler was trying to steal his friend. Statler believed there might be a romantic relationship between [Petitioner] and the man. [FN. Joseph's mother testified that Joseph was gay.]

Statler stated that [Petitioner] yelled at him and told him to "'get the fuck'" out of his van and to leave. Statler tried to calm [Petitioner] down and said he did not want any problems. Statler got on his bicycle and left the area.

### 4. The discovery of the body

Sandra Sawler and her boyfriend, Darren Virgo, went to the marina next to the Harbor Drive parking lot on the morning of January 19 at approximately 7:30 a.m. in order to have coffee and go fishing. At approximately 7:40 a.m., as Sawler was returning from getting a sweatshirt from her truck, she saw Joseph's body in some bushes. Sawler returned to Virgo and told him that she thought she had seen a dead body. Virgo went back to the bushes with Sawler, and the two saw Joseph's body.

Sawler and Virgo saw [Petitioner]'s van parked nearby, and approached it. Sawler and Virgo saw [Petitioner] in the rear of the van.

Virgo asked [Petitioner], "'Hey, do you know you're sleeping ten feet from a dead guy?'" [Petitioner] pointed toward the bushes where Joseph's body was, and said, "'Over there?'" Virgo responded, "'Yeah.'" [Petitioner] asked Virgo whether he had called the police, and Virgo told him that he had not. [Petitioner] said that he would call the police. [Petitioner] then asked Sawler and Virgo whether they were going to wait for the police, and they responded in the affirmative.

Sawler and Virgo walked away from the van. Within seconds, [Petitioner] left his van and walked out of Sawler and Virgo's view. [FN. At trial, Sawler and Virgo both testified that after initially speaking with Grattan, they waited for a while, and then returned to his van when no police arrived at the scene. Sawler and Virgo also both testified that when they returned, [Petitioner] again told them that he would call the police, before walking away. However, video surveillance revealed that Sawler and Virgo interacted only once with [Petitioner] and that [Petitioner] walked away within seconds of their initial encounter.] At approximately 8:27 a.m., Virgo called the police.

### 5. Video evidence

Police recovered video surveillance footage from a total of twelve video cameras placed around the Harbor Drive parking lot and surrounding area from the night and early morning hours of January 18 and 19th. Forensic video expert Grant Fredericks testified concerning the images that could be seen on the surveillance videos.

At approximately 9:18 p.m., [FN. The parties stipulated that the time stamp from the videos was approximately one hour ahead of the actual time. We refer to the actual time in the text, as estimated from the time stamps on the videos.] two individuals were near [Petitioner]'s van, one of whom was on a bicycle. The cyclist rode away and was not seen again. The other individual got into [Petitioner]'s van. At 1:05 a.m., an object, consistent with a human in a wheelchair, moved away from the van and then returned to the van at 1:08 a.m.

At 2:49 a.m., an individual with a blanket draped over his body, walked away from the passenger's rear side of [Petitioner]'s van and then returned to the van. At 2:52 a.m., the same individual walked away from the passenger's side of [Petitioner]'s van to the front of the van, and bent forward near the grille area of the van. At 3:13 a.m., an individual walked away from the front of the van and around a nearby car. Approximately two minutes later, that individual pushed an empty wheelchair about 200 feet away from the van, in the parking lot. The individual then returned to the van's passenger side.

Between 3:22 a.m. and 4:09 a.m., an individual made several trips

3:17-cv-1523-GPC-PCL

from [Petitioner]'s van toward some nearby washrooms and the bay, and then returned to the van. During a couple of those trips, the individual was carrying objects, and on one occasion, at approximately 3:41 a.m., the individual appeared to be dragging something from the van.

At 4:18 a.m., an individual walked away from [Petitioner]'s van, stopped at a garbage container and then walked out of view of the camera at 4:21 a.m. No activity occurred near the van for approximately the next 50 minutes. At approximately 5:10 a.m., an individual who appeared to be wearing the same clothing as the individual who left the van at 4:18 went to the van. [FN. Fredericks testified that the individual appeared to be wearing a "hoodie with . . . light-area fabric underneath . . . ."] No further activity occurred near the van, until Sawler and Virgo approached the van at approximately 7:50 a.m.

### 6. The victim's injuries and cause of death

Paramedics arrived at the scene and determined that the victim, later identified as Joseph, was dead. The medical examiner determined that Joseph died of blunt force trauma to his head, neck and chest. Joseph had numerous broken bones, bruises, and lacerations throughout his entire body.

### 7. Forensic evidence

Drag marks and bloodstains demonstrated that Joseph had been dragged from the van a distance of approximately 22 feet to the bushes where his body was discovered. Police found blood and blood spatter throughout the van, as well as evidence that someone had attempted to clean the interior of the van. A sweatshirt and a shoe found in the van contained DNA that matched both Joseph and [Petitioner]. Police also found [Petitioner]'s DNA in scrapings under Joseph's fingernails. Numerous bloodstains located in the interior of the van and items in the van contained Joseph's DNA.

### 8. [Petitioner]'s arrest

When police arrested [Petitioner] a few weeks after the murder, he had a newspaper article in his backpack about the murder. The article indicated that the police were looking for [Petitioner].

### B. The defense

Two character witnesses testified that they believed that [Petitioner] was nonviolent.

The defense presented evidence that Ketring had interfered with the investigation in various ways. The defense also presented evidence concerning the People's unsuccessful efforts to ensure that Ketring would be available to testify at trial. In addition, the defense presented photographs of the Harbor Drive parking lot in an attempt to demonstrate that Ketring

3:17-cv-1523-GPC-PCL

would have been unable to see [Petitioner]'s van, given the locations of Ketring's van and [Petitioner]'s van on the night of the murder.

(Lodgment 9 at 3-8, internal references omitted.)

Joseph's body was found on January 19, 2012. (Lodgment 5-2 at 372, Lodgment 5-1 at 26.) However, Petitioner had left the scene at that point, and was not apprehended until later. (Lodgment 5-1 at 30.) Petitioner was arrested on February 8, 2012 and subsequently arraigned on charges for first degree murder on February 10, 2012. (Doc. 11-1 at 18, Lodgment 5-1 at 1-2.) After a jury trial, Petitioner was found guilty of first degree murder and sentenced to 25 years to life. (Lodgment 1-14 at 1192, Lodgment 1-17 at 1508.)

After receiving his sentence, Petitioner timely appealed his conviction. (Lodgment 6.) This appeal was based on the same five grounds brought in the current petition filed in this Court. (*Id.* at i-iv.) The Court of Appeal rejected all of Petitioner's claims and denied Petitioner's appeal. (Lodgment 9.) Petitioner then filed a petition for review in the California Supreme Court, bringing the same five claims as brought in the Court of Appeal as well as in this Court. (Lodgment 10.) This petition was summarily denied. (Lodgment 11.) Petitioner now has filed a petition for writ of habeas corpus with this Court. (Doc. 1.)

## III. SCOPE OF REVIEW

A federal court "shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of state court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see Park v. California*, 202 F.3d 1146, 1149-50 (9th Cir. 2000) ("a violation of state law standing alone is not cognizable in federal court on habeas").

This FAP is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. §2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinary deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). Because Petitioner's arguments involve only questions of law, this Court reviews the petition under the "contrary to" and "unreasonable application" clauses of § 2254(d)(1).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Y1st v. Nunnemaker*, 501 U.S.

797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law. *Id*. Clearly established federal law, for purposes of §2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

Where the state court did not reach the merits of a claim because of the imposition of a state procedural bar, "there is no state court decision. . . . to which to accord deference." *Pirtle*, 313 F.3d at 1167. Thus, this court must review those claims de novo. *Id*. However, AEDPA "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S 86, 100 (2011). "Rather, [as the Supreme Court has] explained, '[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.'" *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) (quoting *Richter*, 562 U.S. at 99).

## IV. DISCUSSION

Petitioner is now before this Court claiming habeas relief is appropriate and warranted for five reasons: (1) the trial court's excluding evidence of a key witness's prior bad acts deprived Petitioner of his right to confrontation and due process; (2) the trial court's exclusion of evidence showing Petitioner's good character deprived Petitioner of his right to due process; (3) the trial court's decision regarding the testimony

8

of an unavailable witness deprived Petitioner of his rights to confrontation and due process; (4) there was not sufficient evidence to support Petitioner's conviction for first degree murder; and (5) the cumulative error presented deprived Petitioner of his right to due process. (Doc. 1 at 2.)

Respondent counters these claims stating Petitioner has failed to overcome the relitigation bar AEDPA imposes. (Doc. 11 at 2.) Additionally, Petitioner has not shown the state court decisions on the merits are contrary to precedent from the Supreme Court, involved an unreasonable application thereof, or are based on an unreasonable determination of the facts of the case. (*Id.*) Respondent argues, therefore, the petition should be wholly denied by the Court.

### A. Evidence of Statler's prior bad acts

Throughout his trial, and still now, Petitioner argues he was not the perpetrator of Joseph's murder and is in fact innocent of the charges brought against him. (Doc. 1 at 2, 7, 9.) To prove his innocence, Petitioner argued both at trial and in his petition that he is a peaceful person who does not have the capacity to commit an extreme and gruesome act of violence. (Doc. 1 at 7, 9. Lodgment 5-1 at 177-80.) Thus, Petitioner could not have been the perpetrator of Joseph's murder. Petitioner argues instead Statler is not a peaceful person, and has the capacity to commit this murder. (Doc. 1 at 7, 9.) At trial, Petitioner sought to introduce third party culpability evidence implicating Statler. In a motion in limine hearing, the trial court heard both Petitioner and the prosecution argue their respective positions on allowing or disallowing third party culpability evidence. (Lodgment 1-3 at 42-66.) Ultimately, the trial court, "in an abundance of caution," allowed Petitioner to introduce his theory that a third party committed the murder – specifically, Statler. (Lodgment 1-3 at 66.)

Petitioner's motion to admit the evidence, however, had a second request: Petitioner also sought to introduce the multitude of Statler's numerous previous arrests. (*Id.*) Petitioner argued that these numerous incidents involving violent outbursts from an emotionally volatile Statler would allow the jury to identify Statler as Joseph's actual

murderer. The previous specific instances show Statler had a tendency to respond to situations with serious violence inflicted upon others, as severe violence was inflicted upon Joseph, resulting in Joseph's death.[1]

_____

[1] These arrests were: on September 1, 2005, Statler was arrested for spousal abuse, intimidating a witness, and causing damage to a phone line (Statler's wife called the police following an argument, and while waiting for law enforcement to arrive, Statler hit his wife four times in the face); on September 18, 2005, Statler was arrested for being drunk in public, resisting a peace officer, and fighting in public (extra force was required to detain Statler, who hurled verbal and physical threats at law enforcement); in October of 2005, Statler was arrested for selling marijuana; on February 24, 2006, Statler was arrested for resisting a peace officer and inhabiting a vehicle (when asked to exit the vehicle, Statler wrapped a leather belt with a metal buckle around his knuckles and yelled profanities at law enforcement); on June 17, 2006, Statler was arrested after a car collision where he was seen fleeing the crash site and alcohol was found in the vehicle; on July 14, 2006, Statler was arrested for battery of a police officer and resisting a peace officer (Statler was heavily intoxicated, yelled profanities, and continuously spat on law enforcement); on August 25, 2006, Statler was arrested for providing false information to a police officer (during the arrest, Statler resisted and had marijuana in his possession); in September of 2006, Statler was arrested for battery, driving under the influence, and violating a court order (Statler was observed grabbing his wife's purse and pushing her three times, violating a restraining order); on February 1, 2008, Statler resisted a police officer (while the officer was checking on the welfare of a baby, Statler pushed the officer with his shoulder); in January of 2009, Statler was arrested and convicted of fighting in public; on May 12, 2009, Statler was arrested for threatening a store manager (after he was arrested, Statler began threatening law enforcement as well); on July 20, 2009, Statler was arrested for interfering with paramedics as they tried to treat another person (Statler was volatile and threatened to kill the arresting officers); on February 22, 2010, Statler was arrested for recklessly causing fire to an inhabited structure (Statler was found heavily intoxicated at the scene and pled guilty to the charge); on November 11, 2010, Statler was arrested for being drunk in public after previously being warned and displaying hostility; on March 13, 2011, Statler was arrested for assault with a deadly weapon (Statler resisted arrest and spat on law enforcement saying, "I have AIDS you mother fuckers, and now so do you!"); on June 11, 2011, Statler was arrested for disorderly conduct and being under the influence of alcohol (during the arrest, Statler yelled obscenities, racial slurs, and threatened to harm officers); on July 31, 2011, Statler was arrested for being drunk in public (he became verbally aggressive and threatened law enforcement); on September 20, 2011, Statler was arrested for carrying a concealed dagger; on October 8, 2011, Statler was arrested for battery with serious bodily injury (Statler knocked the victim unconscious and continued to beat the victim as retaliation for the victim's actions); on November 1, 2011, Statler was again arrested for carrying a concealed dagger, this time after telling law enforcement he had no weapons (after being arrested, Statler became hostile and began yelling obscenities); on March 13, 2012, Statler was arrested for loitering (Statler was intoxicated and threatened law enforcement); on April 20, 2012, Statler was arrested for false imprisonment and battery (Statler "snapped" and pushed another man into a small room, then pushed his elbow into the man's neck and threatened him); on May 6, 2012, Statler was arrested for being drunk in public (Statler was combative throughout the arrest and obscenities and racial slurs); on July 2, 2012, Statler was arrested for being drunk in public (Statler was in an In-N-Out and yelling obscenities, and was carrying a knife); on July 6, 2012, Statler was arrested for being drunk in public (Statler was inside a Taco Bell and had been throwing chairs at people); and on September 1, 2012, Statler was arrested for battery with serious

3:17-cv-1523-GPC-PCL

Upon hearing Petitioner's second request, the prosecution argued against the admission of the prior bad acts. (*Id*. at 66-69.) The prosecution contended the prior bad acts did not show any distinctive pattern which would facilitate the jury's ability to learn of the prior arrests, discern any type of modus operandi from those incidents, and conclude Joseph's murder had been perpetrated by Statler. Under California evidence rules, evidence of prior bad acts is not admissible to show a person had a propensity to act in a certain way. Cal. Evid. Code § 1101(a). But, the same may be admissible to show the true identity of the perpetrator of a crime. Cal. Evid. Code § 1101(b). Petitioner argued the latter purpose was the goal of admitting this evidence. (*Id*. at 53.) The trial court, however, agreed with the prosecution that the specific instances would only show Statler's propensity towards violence. (*Id*. at 66.) The trial court further found that the prior instances presented no similarities to Joseph's murder, which ultimately barred their introduction into evidence to show Statler's identity as the true perpetrator. (Lodgment 1-3 at 67.) The trial court found no prior incident "in Mr. Statler's background . . . c[a]me[] close to the brutality of the injuries suffered by the victim of this case. . . ." (*Id*.) Therefore, the trial court excluded the evidence of Statler's prior arrests under California Evidence Code section 1101(b).[2] Furthermore, the trial court found even if the prior instances did show some similarity to the murder of Joseph, the introduction of the prior instances would not prevail against California Evidence Code section 352, which holds evidence may be inadmissible when the probative value is substantially outweighed by the prejudicial effect of the evidence. (Lodgment 1-3 at 67.) The trial court held this evidence's probative value was substantially outweighed by its prejudicial effect, and accordingly excluded the prior instances. (*Id*.)

---

bodily injury (Statler had punched another transient, knocking him unconscious). (Lodgment 5-1 at 9-14.)

[2] The trial court did allow Petitioner to introduce three of Statler's prior bad acts because they were crimes of moral turpitude and thus were admissible to impeach Statler's character for truthfulness. Cal. Evid. Code § 788. (Lodgment 1-3 at 83.)

Petitioner now argues this decision by the trial court denied him the right to present a complete defense because he was unable to show Statler "had the motive, the opportunity, and the temperament to commit" the murder. (Doc. 1 at 6, parenthesis omitted.) Without evidence of Statler's prior incidents of violence, Petitioner was unable to present the jury with the similarities between Statler's prior instances of violence and Joseph's murder. According to Petitioner, a jury could have concluded the same person who has a record of violent outbursts had in fact murdered Joseph in this violent manner, thereby attributing the appropriate temperament to commit this murder to Statler. (Lodgment 1-3 at 52-54.) As a result of the trial court's decision, Petitioner was not able to develop his theory that Statler's identity could be discerned from viewing the prior incidents and the murder of Joseph together.

Respondent continues to contend the trial court did not err in excluding the prior bad acts as inadmissible character evidence. (Doc. 11-1 at 26.) Respondent argues Petitioner did not show, at trial nor in the instant petition, that "Statler previously committed a crime so similar to the charged offense so as to support the inference that the same person committed both acts." (*Id.*) Without such a showing, the evidence of the additional arrests are simply inadmissible character evidence which the trial court was correct in excluding at trial, according to Respondent.

The Court of Appeal held the trial court did not err in making this ruling on the admission of Statler's previous arrests. (Lodgment 9 at 15-16.) Specifically, the Court of Appeal found the trial court properly applied California Evidence Code section 1101(a), and did not abuse its discretion in doing so. (*Id.* at 16.) Accordingly, the Court of Appeal found the trial court's application of state evidence law did not deprive Petitioner of his right to present a complete defense, and therefore the trial court's decision was affirmed. (*Id.*)

The Supreme Court has reiterated the standards of review for a federal habeas court. *Estelle v. McGuire*, 502 U.S. 62 (1991). In *Estelle*, the Supreme Court held the Ninth Circuit erred in concluding the evidence was incorrectly admitted under state law

12

since, "it is not the province of a federal habeas court to reexamine state court determinations on state law questions." *Id*. at 67-68. The Court re-emphasized that "federal habeas corpus relief does not lie for error in state law." *Id*. at 67, citing *Lewis v. Jeffers*, 497 U.S. 764 (1990), and *Pulley v. Harris*, 465 U.S. 37, 41 (1984) (federal courts may not grant habeas relief where the sole ground presented involves a perceived error of state law, unless said error is so egregious as to amount to a violation of the due process or equal protection clauses of the Fourteenth Amendment). Here, Petitioner argues not only that the trial court erred in applying California evidence rules and excluding the specific instance evidence thereunder, but also that in doing so, the trial court denied Petitioner his right to present a complete defense and thus his right to due process. (Doc. 1 at 6.)

Due process includes a criminal defendant's right to "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation and internal quotations omitted). Evidence rules violate this right if they "infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation and internal quotations omitted). Nevertheless, trial judges have "'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90, (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

In Petitioner's case, Petitioner was not precluded entirely from presenting third party culpability evidence implicating Statler. Instead, the trial court only denied Petitioner the opportunity to introduce Statler's numerous previous arrests at trial to show that Statler was the type of person who could have murdered Joseph in such a violent manner. (Lodgment 1-3 at 82.) Petitioner was not, therefore, completely denied the right to present his defense –that Statler was the perpetrator, and not Petitioner – but instead, Petitioner was merely bound by California evidence rules in presenting this defense. (*Id*.)

Specifically, under California Evidence Code section 1101, evidence of a past specific instance is not admissible to prove a person has a propensity for certain conduct, and that a current instance conforms with such conduct. However, this rule has an exception allowing this type of specific instance evidence if it can show "some fact . . . other than [the person's] disposition to commit such an act." Cal. Evid. Code § 1101(b). Because the Court does not reexamine questions of state law on habeas review, the Court will not decide whether or not the trial court was correct in applying this particular portion of the state evidence code. *Estelle*, 502 U.S. at 67-68.

The Court can, however, determine whether the trial court's decision regarding the specific instance evidence disallowed Petitioner from presenting a full defense. The Court finds the trial court did not deny Petitioner such an opportunity. Petitioner was allowed to present his theory that he was innocent and another person had murdered Joseph. (Lodgment 1-3 at 66.) Petitioner was given the opportunity to present evidence tying Statler to the scene of the murder, allocate motive to Statler, and argue the conclusions which Petitioner believed could be drawn from this evidence. (*Id.*) What Petitioner was not allowed to do, however, was violate state evidence rules, and present evidence to show Statler had a propensity to commit such a crime. In his petition, Petitioner specifically states "the jury did not hear evidence showing the extent of Statler's extremely violent temperament." (Doc. 1 at 6.) Use of the prior instances to show Statler has a tendency to act in one way is particularly what California Evidence Code section 1101 seeks to ban. Thus, in excluding evidence of Statler's prior incidents, the trial court did not deny Petitioner due process, but rather only ensured Petitioner complied with state evidence rules. Accordingly, Petitioner's claim to this extent is DENIED.

*B. Evidence of Petitioner's good character*

Petitioner next argues his Fifth, Sixth, and Fourteenth Amendment rights were violated when the trial court denied his request to present evidence of his good character. (Doc. 1 at 7.) At trial, Petitioner sought to introduce evidence of his generosity, helpfulness, and general good character through testimony of witnesses who had known

Petitioner for an extended period of time. (Lodgment 5-1 at 46.) Petitioner's reasoning in introducing this evidence was to show he was not the type of person who would commit such a violent act, but rather, was a docile and caring individual. (*Id*.) The trial court, however, limited the introduction of this evidence to only Petitioner's character for nonviolence, finding the proffered characteristics of Petitioner to be irrelevant. (Lodgment 1-3 at 79-80.) In his petition, Petitioner makes a conclusory claim that his constitutional rights were violated, but does not elaborate on how the trial court's decision violated each of his rights. (Doc. 1 at 7.) Respondent, by contrast, argues this limitation by the trial court was reasonable given the nature of the crime Petitioner was charged with and ultimately convicted of. (Doc. 11-1 at 28.)

The Court of Appeal upheld the trial court's exclusion of this evidence, finding that under California Evidence Code section 1102, a defendant may introduce evidence of his own character traits, so long as the character to be shown is relevant to the charge against him. (Lodgment 9 at 36.) The Court of Appeal found evidence of Petitioner's character for generosity, helpfulness, and kindness were irrelevant to the murder charge Petitioner was facing. (*Id*. at 38.) Because petitioner had been charged with first degree murder and torture was included in the allegations, the trial court was correct and reasonable in limiting Petitioner to only evidence of his character for nonviolence and peacefulness. (*Id*.)

The state's application of its evidence rule does not constitute grounds for federal habeas corpus relief. States have "considerable freedom in adopting procedures for their own courts," and the Court does not "lightly construe the Constitution so as to intrude upon the administration of justice by the individual States." *Perry v. Rushen*, 713 F.2d 1447, 1451-52 (9th Cir. 1983) (quotation omitted) (discussing state's application of its evidence rules), cert. denied, 469 U.S. 838 (1984). Without a more developed argument from Petitioner regarding the constitutional right violations Petitioner alleges, the Court assumes Petitioner is challenging the trial court's application of the state evidence rules.

(Doc. 1 at 7.) This is clearly an inappropriate argument for habeas review. Accordingly, Petitioner's claim to this extent is DENIED.

### C. *Ketring's testimony*

Charles Ketring was one of the prosecution's key witnesses, in that he was one of two witnesses to affirmatively place Petitioner at the van the night of the murder. This testimony was crucial to the prosecution's case because only Ketring and Statler placed Petitioner at his van the night of Joseph's murder. However, because Petitioner argued Statler was in fact the actual murderer, Ketring was the only impartial witness to place Petitioner at the van that night. (Lodgment 1-13 at 780-82, Statler's identification of Petitioner. Lodgment 1-10 at 412-413, Ketring's identification of Petitioner.) Ketring testified at the preliminary hearing; however, at the time of trial, Ketring was unable to be located, thereby allowing Ketring to evade being subpoenaed. (Lodgment 1-8 at 247.)

The prosecution undertook an extensive search to locate and serve Ketring prior to trial, including calling Ketring's cell phone number on a weekly basis, sending the same number text messages, sending letters to all of Ketring's known addresses, searching databases for Ketring (including State databases and Lexis Nexis), visiting the area where Ketring had been known to park his van, and registering Ketring in the Officer Notification System, which would prompt any law enforcement officer running Ketring's identification to notify the prosecution. (Lodgment 1-8 at 221-43.)

At trial, Petitioner argued the prosecution should have known Ketring was a flight risk given Ketring's transient status, and therefore by failing to monitor Ketring or use any additional methods to locate Ketring, the prosecution did not perform due diligence in its attempts to locate Ketring. (*Id*. at 243-44.) Specifically, Petitioner argued that the prosecution was not diligent in its search because the prosecution did not use the same methodology to locate Ketring as law enforcement had used to locate Petitioner. (*Id*. at 244.) Namely, by asking employees or volunteers at the locations where Ketring kept post office boxes to keep an eye out for Ketring and call the prosecution if Ketring visited any of the locations. (*Id*.)

The trial court found the prosecution had exercised due diligence in its search for Ketring, given the multitude of leads the prosecution had pursued attempting to contact Ketring. (*Id*. at 246-47.) In showing reasonable efforts had been made to locate Ketring, the prosecution was able to meet their burden in proving Ketring was unavailable. (*Id*.) The trial court cited case law holding that even if additional measures could have been taken to secure the attendance of a witness, such additional measures would "not affect the conclusion that reasonable efforts" had been made. (*Id*. at 247.)

The Court of Appeal specifically addressed Petitioner's argument that Ketring's homelessness made him more prone to leave the area and evade service of a subpoena. (Lodgment 9 at 27.) However, the Court of Appeal found that Ketring's "behavior inserting himself into the investigation suggested, if anything, that he was interested in the case and would appear at future proceedings." (Lodgment 9 at 27.) Thus, the Court of Appeal affirmed the trial court's finding that Ketring was unavailable.

Once Ketring was deemed unavailable, the trial court ruled Ketring's preliminary hearing testimony would be read in Ketring's stead. (Lodgment 1-8 at 255.) Petitioner argued first that Ketring's preliminary hearing testimony was unreliable. (*Id*. at 250.) Petitioner argued that at the time of the preliminary hearing, Petitioner had not yet begun exploring a third party culpability defense, so Petitioner had additional cross examination to conduct of Ketring to fully develop the record. (*Id*. at 251.) Further, Petitioner contended he was not able to fully develop Ketring's cross examination because Petitioner did not cross examine Ketring about Statler's presence in the marina the night of the murder. (*Id*.) Similarly, Petitioner argued that at the preliminary hearing, Ketring was not deemed the primary identification witness. Instead, the identification was made by both Ketring and Statler – but the prosecution represented Statler as the main identification witness. After Petitioner began pursuing a third party culpability defense implicating Statler as the actual perpetrator of Joseph's murder, Ketring became the de facto primary identification witness. (Id.) Because of this sequence of events, Petitioner was unable to fully cross examine Ketring about his identification of Petitioner the night

of the murder. Therefore, Petitioner argued Ketring's preliminary hearing testimony was unreliable because it was not fully developed.

The trial court disagreed with Petitioner's argument, holding that because the prosecution did not object to any of Petitioner's cross examination of Ketring, Petitioner was not constrained in his cross examination in any way. (*Id*. at 255.) Because Petitioner was seemingly free to explore all areas of interest during Petitioner's cross examination of Ketring, Petitioner was not denied any ability to fully develop Ketring's preliminary hearing testimony. The trial court thus ruled Ketring's preliminary hearing testimony was not unreliable based on Petitioner's inability to fully cross examine Ketring. (*Id*.) In Petitioner's instant petition before the Court, Petitioner specifically notes he was unable to question Ketring as to the source of Ketring's supposed fear to appear at trial and testify.[3] (Doc. 1 at 8.)

Finally, after the trial court ruled Ketring was unavailable and his preliminary hearing testimony would be reenacted for the jury,[4] the prosecution moved to simultaneously admit into evidence Ketring's prior consistent statements made to law enforcement officers. (*Id*. at 247.) The prosecution so moved based on its need to rehabilitate Ketring's character for truthfulness after Petitioner impeached Ketring during the preliminary hearing. (*Id*.) These prior consistent statements were those Ketring had made to law enforcement during the early stages of law enforcement's investigation into Joseph's murder. (*Id*.) The trial court found Petitioner had impeached Ketring during the preliminary hearing by presenting evidence that Ketring had injected himself into the investigation on two occasions: first, by representing himself over the phone as "Dan Miller" who called the District Attorney's office and told the prosecution Petitioner had

---

[3] This fear is not mentioned at any other point in the record. Without further information regarding this alleged fear, the Court does not address this assertion by Petitioner.

[4] Ketring's preliminary hearing testimony was read into the record by the prosecution and defense attorneys reading their respective words, and Robert Eacreat, an employee of the prosecution, reading Ketring's words. (Lodgment 1-10 at 406-439.)

been undercharged; and second, by representing himself over the phone in a call with the prosecution as an attorney for Joseph's family. (Lodgment 1-10 at 437-38.) Ketring denied both of these instances during the preliminary hearing, but other witnesses testified Ketring had indeed made these misrepresentations. (Lodgment 1-14 at 925, 961, 963.) Petitioner argued this evidence of Ketring's misrepresentations showed Ketring had a "general tendency to fabricate." (Lodgment 9 at 307.) Petitioner therefore attacked Ketring's character for truthfulness. In order to rehabilitate Ketring following this impeachment, the prosecution sought to introduce Ketring's two prior consistent statements made to law enforcement shortly after the murder. (*See* Lodgment 1-9 at 445.) The trial court granted the prosecution's motion. (*Id*. at 307.)

In reviewing the trial court's decision to admit Ketring's prior consistent statements, the Court of Appeal presumed, for purposes of the decision, that these statements were erroneously admitted. (Doc. 9 at 28.) The Court of Appeal's presumption was based on California's evidence rule regarding prior consistent statements which holds such statements are admissible only when they are "consistent with [the witness's] testimony *at the hearing*." (*Id*., citing Cal. Evid. § 791 (emphasis added by Court of Appeal).) The Court of Appeal did not engage in an extensive discussion of whether or not the prior statements were in fact inadmissible under this state law given Ketring's absence from the actual trial. (Id. at 30.) Instead, the Court of Appeal simply assumed for purposes of the decision that the testimony was admitted in error, and instead determined whether the admission was nevertheless harmless error. (*Id*.)

The Court of Appeal found the admission was indeed harmless because the prior consistent statements did not provide the jury with any new evidence the jury could use to determine the facts. (*Id*. at 31.) Although Petitioner argued the statements would influence the jury's decision, the Court of Appeal found the "jury was unlikely to attach significant weight to the fact that Ketring had made statements to law enforcement officers that were consistent with his preliminary hearing testimony." (*Id*. at 32.) In conjunction with the remainder of the prosecution's evidence, the Court of Appeal found

19

the admission of Ketring's prior consistent statements was not such that the outcome of the case would have been different had the statements been excluded. (*Id*. at 32-33.) Thus, according to the Court of Appeal, any potential error in admitting Ketring's prior consistent statements was harmless and Petitioner's rights were not violated as a result thereof.

Petitioner argues the trial court's handling of Ketring's testimony – including the trial court ruling Ketring unavailable, allowing Ketring's preliminary hearing testimony to be reenacted, and allowing the prosecution to use Ketring's prior consistent statements to rehabilitate Ketring – violated Petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (Doc. 1 at 8.) The Court finds Petitioner's Sixth Amendment right to confront adverse witnesses is the crux of this claim.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The confrontation clause of the Sixth Amendment provides a criminal defendant with the right to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). The Sixth Amendment's confrontation clause applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 401 (1965).

The right to confront witnesses serves three purposes: (1) to insure reliability by means of oath, (2) to expose the witnesses to cross-examination, and (3) to permit the trier of fact to weigh the demeanor of the witness. *California v. Green*, 399 U.S. 149, 158 (1970). The confrontation clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective to whatever extent the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam); *United States v. Tome*, 3 F.3d 342, 352 (10th Cir. 1993), *rev'd on other grounds*, 510 U.S. 1109 (1994). This precept does not diminish because the defense's opportunity to cross-examine the declarant arises at a preliminary hearing. *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992).

A defendant's confrontation right, moreover, is not absolute. In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court formulated a two-part test for determining the admissibility in a criminal proceeding of out-of-court statements.

> First, in conformance with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant.

*Id*. at 65. Second, once the declarant is shown to be unavailable, the prior testimony is admissible "only if it bears adequate indicia of reliability. Reliability can be inferred . . . where the evidence falls within a firmly rooted hearsay exception or shows particularized guaranties of trustworthiness." *Id*. at 66.

Under the first prong of the *Roberts* test, a witness is unavailable when he cannot be located, so long as the prosecution exercised due diligence in its efforts to locate the witness. This showing requires the prosecution to establish that it made a good-faith effort to locate the witness and compel him or her to appear at trial. *Hardy v. Cross*, 565 U.S. 65, 69 (2011) (citing Barber v. Page, 390 U.S. 719, 724-25 (1968)). Whether the prosecution's attempts to obtain the witness's appearance constitute a "good-faith effort" is determined under a reasonableness standard. *Hardy*, 565 U.S. at 70-71. In *Hardy*, the Supreme Court, however, made clear that "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how uncompromising." 565 U.S. at 71. Moreover, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Id*.

Here, the prosecution made a number of efforts to locate Ketring in order to serve him with a subpoena. Included in these efforts were weekly phone calls made to a number associated with Ketring, routine text messages sent to the same number, letters were sent to all addresses associated with Ketring, law enforcement databases were

searched, medical examiners offices and hospitals were searched, state databases were searched, and investigators from the prosecution physically visited the marina where the murder occurred to determine whether Ketring was still living in his vehicle there. (Lodgment 108 at 221-43.) None of these efforts were successful in locating Ketring. Despite the unsuccessful nature of the efforts, the Court of Appeal found the prosecution did exercise due diligence in attempting to locate Ketring. (Lodgment 9 at 28.) This Court agrees. *See Hardy,* 565 U.S. at 71-72 (explaining that the prosecution need not "exhaust every avenue of inquiry" to establish good faith effort to locate a witness).

Under the second prong of the *Roberts* test, Ketring's prior testimony has "indicia of reliability." 448 U.S. at 66. "'There has traditionally been an exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant.'" *Dres v. Campoy*, 784 F.2d 996, 998 (9th Cir. 1986) (quoting *Barber*, 390 U.S. at 722); *see also Acosta-Huerta v. Estelle*, 7 F.3d 139, 143 (9th Cir. 1993). Here, the former preliminary hearing testimony was made under oath, Petitioner and his counsel were present, and Ketring was subject to cross-examination. *California*, 399 U.S. at 165-66; *Dres*, 784 F.2d at 1001; *United States ex. rel. Bell v. Director, Dept. of Corrections*, 847 F.2d 399, 400 (7th Cir. 1988); *Holt v. Wyrick*, 649 F.2d 543, 548-9 (8th Cir. 1981), *cert. denied*, 454 U.S. 1143 (1982). Thus, to the extent Petitioner argues the trial court erred in finding Ketring unavailable, Petitioner's argument fails.

Petitioner next argues the trial court erred in admitting Ketring's preliminary hearing testimony during trial. (Doc. 1 at 6.) Petitioner's argument to this extent also fails. The Supreme Court has never held that a criminal defendant who is afforded an opportunity to cross-examine a witness at a preliminary hearing is denied his right to confrontation when that witness becomes unavailable and his preliminary hearing testimony is read to the jury. *Al-Timimi v. Jackson*, 379 Fed. Appx. 435, 2010 WL 2161797, *4 (6th Cir. 2010) (noting lack of Supreme Court precedent for foregoing

proposition). On the contrary, the Supreme Court has suggested that "there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demand of the confrontation clause where the witness is shown to be actually unavailable." *Barber*, 390 U.S. at 725-26; *see also California*, 399 U.S. at 165 (noting that testimony given in the preliminary hearing setting is equivalent to testimony given at trial and that defendant was given "every opportunity to cross-examine" unavailable witness).

Here, Petitioner argues he was not allowed an opportunity to fully cross examine Ketring for three reasons: first, at the preliminary hearing, Ketring had not yet been deemed the primary identification witness; second, at the preliminary hearing, Petitioner had not yet begun developing his third party culpability defense, and thus could not effectively cross examine Ketring regarding Statler's actions and whereabouts that evining; and third, Petitioner claims Ketring evaded being served with a subpoena because he was afraid of something which could be a bias which was not uncovered earlier. (Doc. 1 at 8.) The trial court however found Petitioner had not been restrained in any way by the prosecution during Petitioner's cross examination of Ketring. (Lodgment 108 at 255.) Given petitioner's free reign during this cross examination, the trial court found Petitioner was allowed a full and fair opportunity to cross examine Ketring, despite Petitioner's arguments that this new information denied him such an opportunity. Under these circumstances, courts generally have found that no confrontation clause violation occurs. *See Delgadillo v. Woodford*, 527 F.3d 919, 926 (9th Cir. 2008); *Glenn v. Dallman*, 635 F.2d 1183, 1186-1187 (6th Cir. 1980) (finding eyewitness's identification testimony at preliminary hearing admissible against defendant at trial even though defendant declined to thoroughly cross-examine witness); *United States v. Zurosky*, 614 F.2d 779, 791-93 (1st Cir. 1979) (same); *see also Magouirk v. Warden, Winn Corr. Center*, 237 F.3d 549, 553 (5th Cir. 2001) (finding that admission of preliminary hearing testimony violated confrontation clause where "every attempt" by defense counsel to

cross-examine witness was "thwarted" by prosecution's objections, which were sustained by trial court).

Finally, Petitioner argues Ketring's previous statements made to law enforcement were erroneously admitted by the trial court as prior consistent statements. (Doc. 1 at 8.) This claim fails to state a cognizable federal habeas claim because the claim rests on an application of state evidentiary law. *See Estelle*, 502 U.S. at 67-68. Accordingly, Petitioner's claim that he was deprived of his Fifth, Sixth, and Fourteenth amendment rights were violated through the admission of Ketring's testimony is DENIED.

### D. Insufficient evidence

Next, Petitioner argues there was insufficient evidence for a jury to convict Petitioner of first degree murder. (Doc. 1 at 9.) Petitioner contends there was not sufficient evidence to show premeditation or deliberation, or, alternatively, sadistic purpose.[5] (*Id*.) Contrarily, Respondent argues there is a significant amount of evidence both implicating Petitioner as Joseph's murderer and to show there was either premeditation and deliberation, or that Petitioner murdered Joseph for a sadistic purpose. (Doc. 9-2 at 45-49.) The Court of Appeal found there was sufficient evidence to uphold Petitioner's conviction, given the magnitude of injuries inflicted upon Joseph and the fact that no single injury was thought to cause his death. (Lodgment 9 at 42-43.)

The due process clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *accord Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Thus, a state prisoner who alleges the evidence introduced at trial was insufficient to support the jury's

---

[5] Petitioner was charged with first degree murder based on two theories: premeditation and deliberation, and torture. When the jury gave its verdict, there was no indication whether it unanimously found first degree murder on one theory or the other (Lodgment 1-16 at 1192.) This is irrelevant, however, because each individual juror could have used either theory to convict. As such, Petitioner was required to address each theory in turn when arguing insufficient evidence.

findings states a cognizable federal habeas claim. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). The prisoner, however, faces a "heavy burden" to prevail on such a claim. *Juan H.*, 408 F.3d at 1274, 1275 n.13. The question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

When determining the sufficiency of the evidence, a reviewing court makes no determination of the facts in the ordinary sense of resolving factual disputes. *Sarausad v. Porter*, 479 F.3d 671, 678 (9th Cir. 2007), *vacated in part*, 503 F.3d 822 (9th Cir. 2007), *rev'd on other grounds*, 555 U.S. 179 (2009). Rather, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995); *see also Jackson*, 443 U.S. at 319, 324, 326.

In post-AEDPA cases, where, as here, a state court has issued a reasoned decision rejecting a claim of insufficient evidence under a standard that is not "contrary to" *Jackson*, a reviewing federal court applies an additional layer of deference. *Juan H.*, 408 F.3d at 1274. "[A] federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was objectively unreasonable." *Cavazos v. Smith*, 565 U.S. 1 (2011) (*per curiam*); *see also Juan H.*, 408 F.3d at 1275 n.13. This "double dose of deference . . . can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *see also Coleman v. Johnson*, 566 U.S. 650 (2012) (*per curiam*) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference").

A state court's resolution of an insufficiency of evidence claim is evaluated under 28 U.S.C. § 2254(d)(1), not § 2254(d)(2). *Emery v. Clark*, 643 F.3d 1210, 1213-14 (9th Cir. 2011) ("When we undertake collateral review of a state court decision rejecting a

claim of insufficiency of the evidence pursuant to 28 U.S.C. § 2254(d)(1) . . . we ask only whether the state court's decision was contrary to or reflected an unreasonable application of *Jackson* to the facts of a particular case"); *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) ("The pivotal question, then, is whether the California Court of Appeal . . . unreasonably applied *Jackson* in affirming Petitioner's conviction for second-degree murder"); *Boyer*, 659 F.3d at 965 ("[T]he state court's application of the *Jackson* standard must be 'objectively unreasonable' to warrant habeas relief for a state court prisoner"); *Juan H.*, 408 F.3d at 1275 ("[W]e must ask whether the decision of the California Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of this case") (citing 28 U.S.C. § 2254(d)(1)).

In adjudicating an insufficiency of the evidence claim, a federal habeas court "look[s] to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction]." *Juan H.*, 408 F.3d at 1278 n.14. In determining whether the evidence was sufficient, a federal court must follow the California courts' interpretation of state law. *Bradshaw v. Richey*, 546 U.S. 74 (2005).

Under California law, first degree murder includes murder perpetrated by "torture, or by any other kind of willful, deliberate, and premeditated killing[.]" Cal. Pen. Code § 189.

"To prove the killing was 'deliberate and premeditated,' it shall not be necessary to prove the defendant maturely and meaningfully reflected upon the gravity of his or her act." Cal. Pen. Code § 189. "[P]remeditation and deliberation can occur in a very short period of time." *People v. Bloyd*, 43 Cal.3d 333, 348 (1987). In *People v. Anderson*, 70 Cal.2d 15, 25-27 (1968), the California Supreme Court established a framework for determining whether a killing was deliberate and premeditated. Under the *Anderson* framework, evidence of premeditation and deliberation includes:

> (1) facts about how and what defendant did prior to the actual killing which show that the defendant was engaged in activity directed toward, and

explicable as intended to result in, the killing — what may be characterized as planning activity; (2) facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a motive to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of a pre-existing reflection and careful thought and weighing of considerations rather than mere unconsidered or rash impulse hastily executed; [and] (3) facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design to take his victim's life in a particular way for a reason which the jury can reasonably infer from facts of type (1) or (2).

*Id*. at 26-27 (italics in original) (internal quotation marks and citation omitted). First degree murder typically requires evidence of: all three *Anderson* types; strong evidence of type (1); or evidence of type (2) in conjunction with either type (1) or type (3). *Id*. at 27.

Murder by means of torture is "murder committed with a wilful, deliberate, and premeditated intent to inflict extreme and prolonged pain." *People v. Steger*, 16 Cal.3d 539, 546 (1976). "The assailant's intent must be to cause cruel suffering on the part of the object of the attack, either for the purpose of revenge, extortion, persuasion, or to satisfy some other untoward propensity." *People v. Walkey*, 177 Cal.App.3d 268, 274 (1986) (internal quotation marks and citation omitted). Although a defendant "need not have any intent to kill to be convicted of [murder by torture,]" the defendant "must have the defined intent to inflict pain." *Steger*, 16 Cal.3d at 546. "Whether a defendant had a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain may be inferred from the circumstances surrounding the killing." *Walkey*, 177 Cal.App.3d at 274.

The Court of Appeal found there was sufficient evidence of both theories:

The record contains evidence from which a reasonable jury could find that the killer beat a disabled victim to death over a prolonged period of time by inflicting injuries over nearly his entire body. The victim's injuries included a lacerated tongue, bruising and scraping of the penis and scrotum, multiple fractured ribs on both sides of the chest, fractured nasal bones, a fractured hyoid bone [FN. According to a medical examiner, the hyoid bone

is a "horseshoe shaped bone" located at "the base of the tongue."] and a broken Adam's apple. The victim had bruising, contusions and lacerations over his entire body. A medical examiner testified that in his opinion, none of victim's injuries would have been immediately fatal, and that his death was not rapid. This evidence is sufficient to support a finding that the killer committed a willful, deliberate and premeditated murder. (See [People v.] Shamblin[ (2015) 236 Cal.App.4th 1], 11 (evidence as to "the manner of killing alone" may "support [] a finding of premeditation and deliberation" where the evidence supports finding that killing took place over a pronged period of time).)

The same evidence also supports a finding that the murder was committed by means of torture. Medical testimony concerning the victim's injuries constituted evidence that the killer committee "acts causing death that involve a high degree of probability of death," and "a causal relationship between the torturous act and death." ([People v.] Edwards [2013] 57 Cal.4th [658,] 715-16.) Moreover, evidence that the killer perpetrated a savage beating of a disabled victim constitutes evidence from which the jury could reasonably find that the killer intended to inflict extreme pain for a sadistic purpose. (*See id*. at 716 ("evidence of an 'unusually forcible strangulation attempt' together with other violent acts . . . [constitutes] sufficient evidence of a premeditated intent to inflict extreme and prolonged pain").) In particular, evidence that the killer inflicted numerous injuries to the victim's geitals constitutes evidence of a premeditated intent to inflict extreme and prolonged pain. (*See People v. Whisenhunt* (2008) 44 Cal.4th 174, 201 (concluding that evidence was sufficient to support first degree murder by torture where defendant inflicted horrific injuries on victim including burns to "her genital region" and stating "jury may infer the required mental state for murder by torture form the condition of the victim's body").)

Accordingly, we conclude that there is sufficient evidence in the record to support the jury's finding that the murder was of the first degree.

(Lodgment 9 at 42-43.)

Because the state court reviewed the evidence to determine whether a rational jury could find premeditation and deliberation, or torture for a sadistic purpose, the Court of Appeal applied the correct test under *Jackson*. Therefore, the Court reviews to determine whether the Court of Appeal's decision was an unreasonable application of *Jackson*. In reviewing under this standard, the Court first observes that petitioner has not presented

3:17-cv-1523-GPC-PCL

any clear and convincing evidence which would rebut the presumption that the state court's factual determinations are accurate. *See* 28 U.S.C. § 2254(e)(1). In light of the facts as determined by the state court, the Court of Appeal's application of *Jackson* was not unreasonable. Specifically, a juror could have found that the extensive injuries inflicted upon the victim in conjunction with the jealousy which the prosecution argued fueled the attack and ultimate murder is sufficient to show premeditation and deliberation. Additionally, a rational juror likely would have deemed significant the fact that no singular injury was the cause of Joseph's death; instead, it was the combination of the injuries which were fatal. (Lodgment 1-13 at 903.) The totality of these facts would lead to a rational juror finding Petitioner did in fact commit first degree murder.

Thus, because under the *Jackson* rule, the Court finds there was sufficient evidence for a rational juror to find Petitioner had committed the murder of Joseph beyond a reasonable doubt under a premeditation and deliberation or torture theory, Petitioner's argument of insufficient evidence is DENIED.

### E. Cumulative Error

Finally, Petitioner argues his right to fair trial was violated given the accumulation of alleged errors made by the trial court. (Doc. 1 at 9.) As discussed thoroughly above, the Court finds there were no such errors. Given the absence of error, certainly no cumulative error can exist. Therefore, Petitioner's claim of cumulative error is DENIED.

### **V. CONCLUSION**

This Report and Recommendation is submitted to the Honorable Gonzalo P. Curiel, United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(c)(1)(c) of the United States District Court for the Southern District of California. For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **<u>DENYING</u>** the Petition for Writ of Habeas Corpus.

Any party may file written objections with the Court and serve a copy on all parties on or before **May 4, 2018**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **May 11, 2018**.  The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Ylst*, 951 F.2d at 1157 (9th Cir. 1991).

    **IT IS SO ORDERED.**

Dated:  April 20, 2018

Hon. Peter C. Lewis
United States Magistrate Judge